Filed 11/25/24  Cervantes v. Los Angeles County Metro. Trans. Auth. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARIA CERVANTES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, <br><br> Defendant and Respondent. | B322192 <br><br> (Los Angeles County Super. Ct. No. BC693846) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cary H. Nishimoto, Judge.  Affirmed.

Arbogast Law and David M. Arbogast; Law Offices of Steven Ibarra and Steven Ibarra; The Arkin Law Firm and Sharon J. Arkin for Plaintiff and Appellant.

Ivie McNeill Wyatt Purcell & Diggs and W. Keith Wyatt; Greines, Martin, Stein & Richland, Edward L. Xanders, and Alex Chemerinsky for Defendant and Respondent.

Plaintiff and appellant Maria Cervantes (Cervantes) sued defendant and respondent Los Angeles County Metropolitan Transportation Authority (MTA) after she fell and sustained injuries aboard an MTA bus. The case proceeded to trial, and the jury returned a verdict for MTA—finding the agency had not been negligent. In this appeal from the resulting judgment, we consider, in the main, whether the trial court erred in instructing the jury on general negligence and dangerous condition of public property and in excluding testimony of Cervantes's proposed safety expert and evidence of the results of an evaluation by MTA's Accident Review Board (ARB).

## I. BACKGROUND

### A. The Accident

On June 8, 2017, Cervantes boarded an MTA bus and walked toward an open seat. Before she got there, the bus driver, Darryl Bowman (Bowman), accelerated away from the bus stop. Cervantes fell and was injured. The incident was captured on video.

Cervantes filed suit against MTA alleging its employee Bowman had acted negligently and its negligence caused her injuries. MTA answered the complaint with a general denial and asserted a series of affirmative defenses, including an assertion that Cervantes's own negligence caused or contributed to her injury.

### B. Motions in Limine

#### 1. Motion in limine to exclude ARB evidence

Prior to trial, MTA filed a motion in limine to exclude evidence of post-accident investigations and evaluations

conducted by MTA. Though the appellate record does not reveal all the details of the post-accident investigation and evaluation process, it appears MTA convened a first-level ARB comprised of three MTA supervisory personnel who reviewed the accident and determined whether it was avoidable or not. Two of the three members of the first-level ARB, Shakana Turner (Turner) and Christopher Doan (Doan), concluded the accident was avoidable and each completed a written report that cited the rules and standard operating procedures (SOPs) they believed Bowman violated.[1] Doan and Turner both concluded Bowman violated MTA rule 3.20 (regarding mirror use) and SOP 3.152 (addressing "Methods for Avoiding . . . Onboard Falls"), but Turner additionally believed Bowman also violated other rules and SOPs.

MTA's motion in limine argued evidence of Turner and Doan's conclusions should be excluded under Evidence Code section 352 because it would risk confusing the issues at trial. MTA maintained the purpose of ARBs is to promote the safe operation of public transit, not to assess legal liability for negligence. In addition, MTA argued the ARB process was a subsequent remedial measure that should be excluded under Evidence Code section 1151.[2]

---

[1]     The record suggests the third member of the first-level ARB, Patrick Corral, found the accident was unavoidable.

[2]     The statute provides: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."

3

Cervantes opposed the motion in limine and contended evidence of Turner and Doan's conclusions should not be excluded under either Evidence Code provision. Cervantes argued, in connection with Evidence Code section 1151, that no subsequent remedial measures had been adopted. Citing *Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472, Cervantes also argued internal determinations of compliance with internal MTA policies and procedures were relevant because the policies and procedures themselves were relevant to determinations of liability. In Cervantes's view, the jury would understand that evidence of the ARB's determination was introduced to assist the jury in making its determination, not to supplant that determination.

At the hearing on the motion in limine, the court stated the issue was whether the bus driver caused the fall. The court concluded the fact that Bowman was subjected to discipline spoke for itself, and the ARB's report and testimony related to that report was unnecessary. The court stated that if Bowman denied having been disciplined, Cervantes could then bring in testimony from Doan or Turner—but could not do so otherwise.[3]

The court's subsequently issued written ruling described the motion in limine as having been "conditionally granted." The court found Bowman's discipline was relevant to the issue of negligence. That, however, made Turner and Doan's depositions

---

[3]   During the hearing, the court also remarked the issue in the case was whether there was negligence in the operation of the bus and mused there was nothing that constituted a dangerous condition of public property. The trial court also stated it did not intend to instruct the jury on dangerous condition of property principles of liability.

4

"irrelevant and unnecessary unless [Bowman] claims he was not disciplined." The court found there was no subsequent remedial conduct because the evidence went to a finding of fault, not curative changes. The court also identified testimony that might be admitted depending on how Bowman testified, and other testimony that would be relevant regardless: "[T]estimony of Turner and Doan may become relevant to the limited extent that Turner and Doan each had different criticisms of Bowman's driving regarding Rule violations. Mr. Doan's deposition testimony regarding when it is safe to accelerate from the bus stop is admissible as relevant to the issue of negligence, especially in combination with the video of the accident. Beyond this evidence, the written findings of [the ARB] are irrelevant and unnecessary to the jury's duty to determine if plaintiff has met its burden of proof."

### 2. *Motion in limine to exclude plaintiff's expert testimony*

In addition to its ARB motion in limine, MTA filed a motion in limine to preclude expert testimony regarding liability issues. The motion argued the facts of the accident were clearly depicted on video, expert opinions on liability would be based on the same information available to the jury, and the experts could not add any information that was beyond the jury's common experience. MTA accordingly sought to exclude testimony from Cervantes's proposed safety expert, Brad Avrit (Avrit), and her biomechanical engineering expert, Bradley Rutledge (Rutledge). Because the trial court allowed Rutledge to testify, we describe the motion only insofar as it related to Avrit.

Avrit's deposition revealed he intended to offer the following opinions at trial: (1) Bowman failed to act safely because he pulled away from the curb and accelerated before Cervantes was adequately seated or secured within the bus; (2) Bowman had the ability to determine whether Cervantes was seated or secured by looking in his mirror but either did not do so or violated safe practices by accelerating before she was seated or secured; (3) the practice of ensuring a customer is seated or secured before accelerating is heightened on a rainy day because there's an increased risk of someone slipping when the floor is wet; (4) Bowman failed to comply with MTA's "own policies . . . which are consistent with industry standards" in that he did not ensure Cervantes was seated or secured before accelerating; (5) a change in MTA's SOPs was less specific for avoiding accidents or onboard falls; and (6) there was a question as to whether Bowman accelerated in a safe manner. Cervantes contended these opinions were appropriate to establish the applicable standard of care as it relates to when an MTA bus should depart after passengers have boarded.

The trial court found Avrit's expertise was unnecessary to a determination of fault because ordinary people experience life without having engineering and biomechanical expertise. The court further found the jury could determine whether Bowman was negligent by the admissible evidence in the case; whether Bowman was negligent or not was not the proper subject of expertise.

C.  *Trial*

Video of Cervantes's fall on the bus was played for the jury at trial. The copy of the video included in the appellate record

depicts Cervantes boarding the bus, passing a man who was obstructing a vertical pole just before the first seats, walking down the center aisle without holding onto any support devices, and falling shortly after the bus begins moving.

### 1.      *MTA's Rules and SOPs*

The jury was presented with excerpts from both the 1994 and 2013 versions of the MTA Policies and Procedures handbook. The 1994 handbook contained the following pertinent rules and SOPs.

Rule 3.20, regarding "Mirrors" provided that, "[a]ll mirrors must be properly adjusted.  Mirrors must be checked every three (3) to five (5) seconds to properly observe the area inside and around the bus."  Rule 3.22 provided, "[o]perators must maintain a safe speed while attempting to remain on schedule.  Safety must never be sacrificed for schedule."   SOP 3.150, which addressed "Methods to Avoid Accidents when Entering and Leaving the Bus Zone," provided in pertinent part that when leaving stops, a bus operator was to "[u]se mirrors to check that boarding and alighting customers are clear of doors before closing[,]" and to "[m]ake sure customers are seated or holding on prior to moving."  SOP 3.152, which addressed "Methods to Avoid Onboard Falls" instructed operators to, among other things, "[s]tay aware of customer movements onboard and adjust your operation accordingly[.]"

The 2013 version of the handbook includes a revised version of SOP 3.150.  It instructs drivers that "[f]ollowing these procedures decreases the probability of having a traffic collision and/or passenger fall when entering or departing a bus zone" and states "[c]aution and good judgment is recommended before

7

departing a bus zone as customers move about the bus to find a seat, hold onto a stanchion bar or grab rail." The 2013 version of SOP 3.152, regarding methods for avoiding onboard falls, instructs drivers to "[m]onitor interior mirrors, be aware of customers' movements and adjust operation accordingly."

### 2. *Bowman's testimony*

Bowman had been a bus operator for MTA for 22 years at the time of trial. He started working for MTA in 1999. After he was hired, Bowman was given an MTA Policies and Procedures handbook to study. He also received training and took a variety of tests. According to Bowman, MTA's rules were the "do's and don'ts" that everyone had to follow, and the SOPs were MTA's recommendations for how they wanted employees to handle certain situations. Drivers are expected to keep copies of the rules and SOPs with them while operating buses.

Bowman was trained to make sure passengers have the opportunity to hold on to support devices after they board the bus. He was trained that once a passenger passes the yellow line (or limit line) at the front of the bus, it is safe for him to move the bus. To Bowman, a passenger passing the yellow line meant he had given the passenger the opportunity to hold onto the provided devices, including the poles and straps, and to take a seat. But Bowman explained he, at times, likes to give passengers four or five additional seconds. Bowman was also trained to monitor his mirrors and customers' movement and adjust his operations accordingly. He was trained to apply smooth and slow acceleration, and asserted he does so all the time. He was also trained to routinely scan his mirrors and be

8

attentive to changing conditions. Bowman did not believe he sacrificed passenger safety on the day of the incident.

Bowman also testified about Cervantes's fall specifically. It was drizzling when Cervantes boarded the bus. The floor was wet from people coming in from the rain with umbrellas, but Bowman did not observe any puddles. Bowman was running three minutes behind schedule when Cervantes was injured. Bowman waited until she passed the yellow line, and he gave her an opportunity to hold onto support devices the way he was trained. Bowman saw Cervantes standing or walking in his mirror.[4] Bowman then checked his left mirror to see if he could merge into traffic. Bowman then began driving and his departure from the bus zone was smooth and gentle. Shortly thereafter he was informed a lady had fallen. He pulled over and contacted dispatch so they could call for emergency medical assistance.

Counsel for Cervantes asked Bowman if he was disciplined by MTA for violating SOP 3.152. Bowman responded, "Yes, I was disciplined." Counsel additionally asked Bowman if it was true that he was told by MTA that he did not wait for the patron to sit down before moving the bus when it was wet from rain. MTA objected on the ground that the evidence was the subject of a motion in limine. The court sustained the objection. Counsel for Cervantes asked Bowman if he knew if he was disciplined for violation of Rule 3.20. The court sustained MTA's objection to

---

[4] Bowman was impeached with his deposition testimony, in which he stated he briefly looks in the mirror after a passenger pays their fare, but does not pinpoint a passenger.

that question too, as well as to additional questions regarding the basis for Bowman's discipline.

Counsel for Cervantes thereafter made an oral motion for mistrial because the court precluded questioning about the reasons for Bowman's discipline. The court denied the motion.

### 3. Cervantes's testimony

Cervantes does not drive. She uses public transportation instead, and it is second nature for her to ride the bus. Cervantes had never fallen on a bus prior to this incident.

It was cloudy and drizzling while Cervantes waited for the bus on the day she fell. She was wearing one- or two-inch heels, which she had worn on the bus plenty of times before because they were nonslip and comfortable. As the bus arrived, she saw some people were standing on the bus, which led her to think it was full. Cervantes did not know if there was water on the floor of the bus when she boarded it, but her understanding was the floor was not wet.

When Cervantes boarded the bus, she paid her fare and saw a man holding onto a bar. She continued walking and headed toward an empty seat.[5] Cervantes was not holding on to anything while she walked through the bus, and she did not have an opportunity to grab onto anything as she began to fall. Cervantes believed she would have made it to an open seat in a few more seconds. Parts of Cervantes's dress were wet after she fell.

---

[5]     She passed an open (but partially blocked) seat between two men, but she decided not to try to sit in that seat.

10

Cervantes's usual practice when boarding a bus was to go toward a nearby empty seat while holding on if possible. Cervantes could hold on to vertical poles inside the bus when they are unobstructed, but she could only reach the horizontal poles on her tip toes. Cervantes could also reach the straps that hang down from the poles on her tip toes, but she was not stable and tended to sway when she held them. When she has held them in the past, she has fallen onto other passengers or otherwise invaded their personal space. She would also hold onto bus seats when available. Cervantes did not hold on to any straps during her walk on the bus, but she conceded she could have.

Cervantes fractured her ankle, and subsequently underwent surgery and physical therapy. The injury was still causing pain at the time of trial.

### 4. *Expert testimony regarding the accident*

Rutledge, an accident reconstruction expert and biomechanical engineer, testified regarding his analysis of the accident. He was asked to reconstruct what happened and perform a biomechanical analysis of Cervantes's loss of balance and the available friction.

Rutledge testified, based on the video, that the bus began moving six seconds after Cervantes boarded the bus, and 2.6 seconds after she crossed the limit line. Cervantes fell 1.3 seconds after the bus began moving, and 8.8 feet past the limit line. Cervantes had to travel approximately five more feet to reach a completely open row of seats. Based on her walking speed, Rutledge stated she needed two more seconds to get to the

open row[6]. Rutledge stated there was a vertical grab bar right past the limit line, which a man was leaning against when Cervantes boarded. There were vertical straps she could have potentially grabbed.

Rutledge stated he believed Cervantes experienced a slip-induced loss of balance and opined she experienced a right foot heel slip based on the way her body was moving in the video. Based on his analysis, Rutledge believed the primary causative factor for Cervantes's loss of balance was the movement of the bus. He stated the other causative factors were Cervantes's footwear, the walkway surface, a contaminant, and her walking pattern.

Rutledge additionally testified that from a slip and fall risk perspective, one needs to take into consideration whether or not there may have been a contaminant like water on the floor. Rutledge opined the bus floor was slippery under a wet condition. When asked, he disagreed with the proposition that the bus floor was defective if wet.

D.    *Jury Instructions*
      1.    *Negligence*

Cervantes argued the court should instruct the jury with a modified version CACI 401, regarding the basic standard of care, so that it specified this standard applied only to consideration of any comparative negligence by Cervantes. Cervantes argued such a modification was necessary because MTA is subject to the

---

[6]    Rutledge agreed Cervantes passed a partially open seat, which was obstructed by the legs of the people in the seats surrounding it.

12

higher common carrier standard of care discussed in CACI 902. MTA argued no change was warranted because the standard of care for negligence was applicable to everyone, including a common carrier. The court stated it did not want the instruction to be argumentative, asserting it should simply state what the common carrier standard is. It stated that under the circumstances all that was necessary was a comparative negligence instruction along with a regular negligence instruction, and the court stated the common carrier instruction was different.

### 2. *Dangerous condition*

Prior to trial, the court struck a dangerous condition of public property instruction MTA included in the group of instructions it proposed be given to the jury. During a subsequent jury instruction conference that occurred after both sides rested at trial, MTA argued the court should reconsider instructing the jury on the principles related to a dangerous condition of property because Cervantes had elicited testimony that the floor of the bus was wet and contributed to her fall.

Cervantes objected to adding a dangerous condition instruction because she was not arguing Bowman should have cleaned water off the floor. The court opined that if Cervantes was going to argue she slipped on a wet floor, then the dangerous condition instruction would apply. Cervantes asserted the instructions were unnecessary because she would stipulate that the floor, even with water on it, was substantially safe. MTA, however, argued it was too late to "unring the bell" because Cervantes had been talking about a wet floor throughout the trial and they could not expect the jurors to ignore all the evidence

13

presented. Cervantes then contended MTA's arguments were untimely because the court previously ruled the dangerous condition instructions were not being delivered and Cervantes had not addressed or clarified the issue because she believed it was irrelevant.

The court stated that now that it had heard the evidence, plaintiff was alleging the combination of the sudden movement of the bus and the wet floor were what caused her fall. The court stated if that was not a dangerous condition of public property, Cervantes could not argue she slipped on a wet floor. The court accordingly stated it would give the dangerous condition instruction.

> 3. *The instructions read to the jury, and the withdrawal of the dangerous condition instruction*

The jury was instructed with CACI 5000 which informed the jury that, among other things, "[a]fter you have decided what the facts are, you may find that some instructions do not apply. In that case, follow the instructions that do apply and use them together with the facts to reach your verdict."

The court instructed the jury that a common carrier provides transportation to the general public and MTA was a common carrier at the time of the incident. The court gave CACI 902, on the duty of common carriers, that provided: "Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. [¶] While a common carrier does not guarantee the

14

safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business." The court also instructed the jury by special instruction that if the jury found MTA's rules or SOPs were not followed, it could consider that failure in determining whether Bowman and MTA were negligent.

To account for comparative negligence principles, the court instructed the jury it needed to decide how a reasonably careful person would have acted in both MTA's situation and Cervantes's situation. Using CACI 401, the court instructed the jury on the basic standard of care that applied to MTA's claim that Cervantes's own negligence had contributed to her harm: "Negligence is the failure to use reasonable care to prevent harm to oneself or to others. [¶] A person can be negligent by acting or failing to act. A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." To clarify matters, the trial court also instructed the jury with CACI 906, which provides that "[w]hile a common carrier must use the highest care for its passengers' safety, passengers need only use reasonable care for their own safety."

When reading the instructions to the jurors, the court read a dangerous condition of public property instruction to the jury. That instruction informed the jury that Cervantes "claims that she was harmed by a dangerous condition of [MTA's] property" and laid out the elements Cervantes was required to prove to establish the claim, including that MTA owned or controlled the property, the property was in a dangerous condition at the time

15

of Cervantes's injury, that the dangerous condition created a reasonably foreseeable risk of the kind of injury that occurred, that negligent or wrongful conduct by MTA's employee acting within the scope of employment created the dangerous condition or that MTA had notice of the dangerous condition for long enough to have protected against it, and that the dangerous condition was a substantial factor in causing Cervantes's harm.[7]

After the court read the instructions to the jury but before the jury was given a copy of the instructions for use when deliberating, MTA changed its position and agreed the dangerous condition instructions should be withdrawn. The parties accordingly agreed to present the jury with a verdict form that did not request findings concerning a dangerous condition of public property and the dangerous condition of property instructions were not included in the packet of written instructions sent to the jury. Cervantes asked the court to specifically inform the jury that the dangerous condition instructions had been withdrawn but the court deemed it unnecessary and declined.

### E.    Closing Argument

During Cervantes's closing argument, she argued MTA, as a common carrier, had to use the highest care and act with the vigilance of a very cautious person while she, as a passenger, needed only use reasonable care for her safety. Cervantes explained reasonableness depended on context and reasonable

---

[7]    The court also read instructions further defining different aspects of the elements necessary to find a dangerous condition existed.

16

care as applied to common carriers required the highest care. At other points during her argument, Cervantes reminded the jury that MTA was required to act with the highest standard of care or with the vigilance of a very cautious person.

In its summation, MTA argued: "There's a definition of negligence that you'll be given, and that is CACI 401. [ . . . ] Negligence is the failure to use reasonable care to prevent harm to one's self or to others. A person can be negligent by acting or by failing to act. A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." MTA stated, "[y]ou must decide how a reasonably careful person would have acted in [MTA's] situation. In other words, you're the bus operator and you get to decide what a reasonably careful bus operator would do when he's operating a bus in the way that Mr. Bowman was on June 8, 2017."

At the same time, MTA also argued that "plaintiff's counsel talked about common carriers and their higher duties, and that's one of the instructions you're going to get. 'Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance and foresight reasonably can do under the circumstance to avoid harm to passengers.'"

When arguing Cervantes herself had been negligent, MTA asserted, "she's held to the same standards of negligence. Counsel's going to tell you that the bus operator has a higher duty, and he does because he's transporting passengers, but the definition of negligence applies to everybody. It applied to Ms. Cervantes. She's required to use reasonable care when she is on

17

the bus."  MTA further argued, "[o]ne of the jury instructions indicate the duty of a passenger for her own safety.  906 says 'while the common carrier must use the highest care for its passengers' safety, passengers need only use reasonable care for their own safety.'  All right.  So passengers have an obligation as well.  You're not going to receive an instruction that tells you the difference between highest care and reasonable care.  Everybody's supposed to exercise reasonable care."

### F.    Jury Deliberations and Verdict

During its deliberations, the jury submitted a question asking if it could see the disciplinary reprimand given to Bowman.  The trial court answered, "No, this was not evidence."

The jury found MTA was not negligent and, as directed, did not answer any other questions on the verdict form.  The court polled the jury, which revealed 10 of the 12 jurors voted in favor of the verdict.

## II.  DISCUSSION

Most of Cervantes's contentions of error lack merit, and none warrant reversal.  First, the trial court's decision to read the general negligence instruction without limiting its application to Cervantes did not, in light of all the instructions read to the jury, improperly suggest that MTA, as a common carrier, was subject to the wrong standard of care.  Second, assuming the court's decision to deliver the dangerous condition of public property instructions was erroneous, that error was harmless under the circumstances: among other things, the negligence instructions that governed the jury's verdict made no reference to a dangerous condition of property and the jury was instructed it could find

18

some of the jury instructions did not apply.  Third, the law did not require the trial court to admit evidence of the ARB decision and it was not an abuse of discretion to exclude the evidence since it was unnecessary to the jury's determination and would have required presentation of two to three additional witnesses. Finally, the court did not abuse its discretion by granting MTA's motion in limine to exclude safety expert Avrit because all but one of his opinions addressed topics within the common understanding of the jury and the only topic that was not would not have affected their analysis.

### A.     Instructional Error
"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  "The trial court's 'duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision.' [Citation.]  'A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' [Citation.]"  (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

"When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.'  [Citation.]  "'For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.'"  [Citation.]  The propriety of jury instructions is a question of law that we review de novo."  (*Cristler*, *supra*, 171 Cal.App.4th at 82.)

19

"Error cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given." (*Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 719; see also *Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

"It is common knowledge that instructions, like statutes, may include in addition to a general rule a special rule applicable only in particular circumstances and that the special rule qualifies the general." (*Sebrell v. Los Angeles Ry. Corp.* (1948) 31 Cal.2d 813, 817-818.)

### 1. Negligence instructions

Cervantes argues the trial court prejudicially erred by reading CACI 401, the general duty of care instruction, without specifying it applied only to Cervantes. She contends this improperly communicated to the jury that Cervantes and MTA were held to the same basic standard of care. Looking to the jury instructions as a whole, bolstered by other parts of the record, we hold there was no error.

Civil Code section 2100 provides: "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." This standard of care requires common carriers "to do all that human care, vigilance, and foresight reasonably can do under the circumstances." (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785.) "Common carriers are not, however, insurers of their passengers' safety. Rather, the degree of care and diligence which they must exercise is only such as can

20

reasonably be exercised consistent with the character and mode of conveyance adopted and the practical operation of the business of the carrier." (*Ibid.*)

The instructions the court read to the jury properly explained the relevant standard of care. The court instructed the jury that MTA is a common carrier. It then instructed the jury that common carriers "must use the highest care and the vigilance of a very cautious person" and "must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers." Of course, the court also instructed the jury on the basic standard of care, explaining "[n]egligence is the failure to use reasonable care to prevent harm to oneself or to others" and generally informing the jury that it must decide "how a reasonably careful person would have acted in [MTA's] situation." Read together, the instructions accurately informed the jury it was to decide how a reasonably careful person would have acted in MTA's situation—the situation of a common carrier charged with using "the highest care and the vigilance of a very cautious person." The court's delivery of CACI 906 further emphasized the concept—explaining that "a common carrier must use the highest care for its passengers' safety" while "passengers need only use reasonable care for their own safety."

We "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" (*People v. Mills* (1991) 1 Cal.App.4th 898, 918), and we therefore assume they were able to properly parse the different portions of the instructions. Moreover, even if the instructions given were somehow seen as irreconcilable (though they are not), "[i]t has long been held that jury instructions of a specific nature control over instructions containing general provisions." (*People*

21

*v. Stewart* (1983) 145 Cal.App.3d 967, 975; see also *Saltzen v. Associated Oil Co.* (1926) 198 Cal. 157, 161.)  Here, the instruction defining the duty of a common carrier, CACI 902, is more specific than CACI 401, which generally defines the standard duty of care.[8]  Thus, on any score, the court's duty of care instructions were not erroneous.

### 2.     *Dangerous condition instructions*

Cervantes also argues the trial court erred by instructing the jury on principles related to a dangerous condition of public property.  Cervantes argues the instructions were improper because she expressly disclaimed and withdrew any dangerous condition cause of action prior to the commencement of trial.  MTA, in turn, contends there was no error because the oral instruction, though withdrawn, was still supported by the evidence.

"Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.]" (*Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1607.)  This principle does not directly address the situation at hand, where the instruction was supported by the evidence but the plaintiff disclaimed any intent to assert the claim the instruction addressed.  We shall assume for the sake of argument

---

[8]     The instruction that a common carrier bears a higher duty of care was also emphasized by Cervantes's closing argument, in which she repeatedly argued that MTA was required to act with the vigilance of a very cautious person.

22

that the trial court erred in delivering the instruction, but the assumed error still does not warrant reversal.

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule*, *supra*, 8 Cal.4th at 580.) "A 'miscarriage of justice' exists when, after examining all the evidence, we conclude ""it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."" [Citation.]" (*Weaver v. Chavez* (2005) 133 Cal.App.4th 1350, 1356-1357.) Several factors must be taken into consideration in determining whether prejudice resulted including "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, at 580-581.) "The closeness of the jury's verdict" (*Weaver, supra*, at 1357) is also a relevant consideration.

It is not reasonably probable that the jury would have reached a result more favorable to Cervantes if the dangerous condition instructions had not been part of the court's oral charge to the jury. The jury was not asked to reach any conclusions regarding the dangerous condition on the verdict form. The parties stipulated to withdraw the dangerous condition instructions before the hard copy was provided to the jury and the instructions were not included in the packet given to the jurors. The jury also did not ask the court any questions in regard to the instructions, or their absence from the written packet. Further, the jury was instructed with CACI 5000, which provide in pertinent part that, "[a]fter you have decided what the

23

facts are, you may find that some instructions do not apply. In that case, follow the instructions that do apply and use them together with the facts to reach your verdict." Under the circumstances, we presume the jurors followed CACI 5000 and determined the dangerous condition instructions among those delivered orally did not apply.[9]

In addition, none of the negligence instructions made any reference to a dangerous condition and the jury was not informed, through jury instructions or the arguments of counsel, that a dangerous condition analysis had any bearing on the question it was required to answer: whether MTA was negligent. Though Cervantes believes, based merely on the order in which the instructions were read, that the jury may have thought it had to find a dangerous condition to find MTA liable, the instructions clearly defined the elements of negligence and a dangerous condition of property was of course not among those elements.[10]

That leaves only the consideration that the jury's finding of no negligence by MTA was not unanimous. That, however, is far too little to permit a conclusion that reading the dangerous

---

[9]     That the trial court did not give CACI 5007, as Cervantes requested, to inform the jury the "claim" was withdrawn does not change our analysis.

[10]     Further, the dangerous condition instruction the jury was read provided that "Cervantes claims that she was harmed by a dangerous condition of [MTA's] property" and identified what Cervantes was required to prove "[t]o establish this claim . . . ." By its plain language, it limited the elements it identified to the establishment of the dangerous condition claim.

24

condition instructions to the jury resulted in a miscarriage of justice.

### B.     *Exclusion of Evidence*

We review the trial court's decision to exclude evidence for abuse of discretion.  *(Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1480-1481; *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.)  "If the exclusion [of evidence] is proper upon any theory of law applicable to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision."  (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173.)  Even where evidence has been erroneously excluded, the judgment or decision shall not be reversed unless the reviewing court concludes the exclusion resulted in a miscarriage of justice.  (Cal. Const., art. VI, § 13; Evid. Code, § 354.)

### 1.     *The ARB Determination and related testimony*

"The trial court enjoys 'broad authority' over the admission and exclusion of evidence.  [Citation.]"  (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295-296.)  The court's "interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.'  [Citation.]"  (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146-1147.)  "[T]he trial court serves as something of a referee, monitoring the progress of the case and precluding wasteful consumption of time."  (*People v. Cegers* (1992) 7 Cal.App.4th 988, 1001.)

The trial court did not abuse its discretion in excluding the proffered ARB evidence under Evidence Code section 352. The trial court has discretion to exclude evidence under this section "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) If Cervantes had been permitted to introduce the evidence, she presumably would have called both Doan and Turner to testify. MTA almost certainly would have responded by calling Corral, the third ARB member who apparently disagreed with Doan and Turner, to testify. The trial court could reasonably believe that admitting all this additional testimony would have consumed unnecessary time and risked giving the jury the impression it must resolve an issue (who was right in the split ARB decision) that was not among the issues it was impaneled to resolve.

Additionally, as the trial court found, the ARB evidence was not necessary for the jury to reach a conclusion on the question of MTA's negligence. During his testimony, Bowman admitted he was disciplined by MTA. While the trial court sustained a series of objections to questions regarding the basis for Bowman's discipline, the jury was presented with the applicable MTA policies. In other words, the jurors were provided with the evidence they needed to determine themselves whether Bowman had violated any particular rule or SOP, and whether MTA was negligent. There was no need for introduction of three additional witnesses on a topic that was not necessary to the jury's determination.

26

Cervantes nonetheless argues the trial court's decision to exclude the evidence was error under *Dillenbeck v. Los Angeles, supra,* 69 Cal.2d 472. That case holds "[t]he safety rules of an employer are . . . admissible as evidence that due care requires the course of conduct prescribed in the rule." (*Id.* at 478.) While *Dillenbeck* does so hold, and subsequent cases have reiterated the principle, that does not help Cervantes. As demonstrated by the quote above, *Dillenbeck* addressed the admissibility of a defendant's internal rules. The trial court here duly admitted MTA's rules and SOPs, which the jury was instructed (via special instruction) it was permitted to consider in its determination of whether MTA was negligent. *Dillenbeck,* by contrast, does not mandate that an internal review board decision be admitted at trial.

*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 927, upon which Cervantes also relies, is also inapposite. That case held a trial court erred by deeming a defendant's internal review report inadmissible on hearsay grounds. The evidence here was not excluded because it was hearsay.

### 2. *Avrit's expert testimony*

"The general test for the admissibility of expert testimony is the question of whether the testimony concerns a subject 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] On appeal, the trial court's decision as to whether expert testimony meets this standard for admissibility is subject to review for an abuse of discretion." (*People v. Johnson* (1993) 19 Cal.App.4th 778, 786-787.)

"[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People v. Cole* (1956) 47 Cal.2d 99, 103; see also *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291 ["[e]xpert opinion should be excluded "'when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness'"'"].)

The trial court excluded Avrit's testimony because it found the testimony was unnecessary to a determination of fault; lay jurors were equipped to determine whether MTA was negligent without his testimony. Though Avrit espoused a number of opinions in the excerpt from his deposition testimony submitted with MTA's motion in limine, Cervantes asserts his primary opinion was that Bowman "failed to comply with [MTA's] own policies—which are consistent with industry standards. That being that . . . when passengers are getting on the bus, you need to make sure that they are secured or seated before you accelerate . . . ." Cervantes argues this opinion about "what the defendant was supposed to do" was necessary for the jury to determine whether Bowman was negligent.

The problem with Cervantes's argument is that evidence of the relevant standard for Bowman's conduct—MTA's policies— was already before the jury. Contrary to Cervantes's assertions, the jury did not need an expert to help it determine whether Bowman had appropriately checked his mirrors or waited for

28

Cervantes to secure herself before pulling away from the bus stop. The jury was capable of applying the facts—drawn from the video and testimony—to MTA's rules and SOPs, none of which described practices that would be outside the common understanding of jurors. The trial court therefore did not abuse its discretion in excluding Avrit's testimony.

Additionally, to the extent Cervantes argues the trial court erred because its exclusion of Avrit's testimony deprived the jury of evidence regarding "industry standards" in particular, Avrit opined MTA's policies were "consistent with" industry standards. Because the two were consistent and the jury was presented with MTA's policies, Avrit's testimony would not have added to or aided the jury's knowledge or understanding of the case. For the same reason, to the extent it was error for the trial court to exclude Avrit's testimony regarding industry standards, that error did not result in a miscarriage of justice warranting reversal.

### C. Cumulative Error

We shall assume, for argument's sake, that the cumulative error doctrine established in the field of criminal law (see, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 844) has application in the context of a civil trial too. Considering the record in its entirety, there is no cumulative prejudice warranting reversal from any of the errors we have assumed to exist for purpose of our analysis. (See *People v. Nadey* (2024) 16 Cal.5th 102, 193.)

29

DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


KIM, J.


DAVIS, J.*

---

*        Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30